STATE of Wisconsin, Plaintiff-Appellant,†

v.

Kevin HARRIS, Defendant-Respondent.

Court of Appeals

*No. 02–2433–CR. Submitted on briefs April 23, 2003.—
Decided June 18, 2003.*

2003 WI App 144

(Also reported in 667 N.W.2d 813.)

† Petition to review granted 10-1-03.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Diane M. Welsh*, assistant attorney general, and *James E. Doyle*, attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Steven A. Koch* of *Seymour, Kremer, Nommensen, Morrissy & Koch, L.L.P.*, Elkhorn.

Before Nettesheim, P.J., Brown and Anderson, JJ.

. ¶ 1. ANDERSON, J. The State appeals from a circuit court order granting Kevin Harris's postconviction motion to withdraw his guilty plea to the charge of first-degree sexual assault, as a repeater, of a child who had not attained the age of thirteen years contrary to

WIS. STAT. § 948.02(1) (2001–02).[2] The State contends that the circuit court erred when it allowed Harris to withdraw his guilty plea because of the prosecutor's failure to turn over information—prior to the entry of the plea—that the child had reported being sexually assaulted by her grandfather. The circuit court did not err in its decision. Accordingly, we affirm.

### Facts

¶ 2. On April 24, 2001, the State filed a criminal complaint against Harris alleging that he had sexual contact with six-year-old B.M.M. and that he had failed to comply with the terms of his bond. Harris was a thirty-one-year-old mentally ill individual with a ninth grade education. The charges were based on a report given by B.M.M. B.M.M. related that when she was looking for a friend in her neighborhood, Harris invited her into his apartment. She said that once she was in his apartment, Harris asked her if she wanted to learn what boyfriends did; he kissed her and touched her vaginal area. She said that she began to cry, left Harris's apartment, and walked home. She told her parents several days later. When contacted by the police, Harris first denied having had a child in his apartment at all. Later, he contacted the police and informed them that B.M.M. had been in his apartment and that he had touched her leg and head.

¶ 3. Harris waived his preliminary hearing on May 2, 2001. The arraignment occurred at that same time. At the arraignment, Harris entered pleas of not guilty to all of the counts, reserving his right to supplement those pleas at a later date. A twelve-person jury

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

trial was set for August 6–8, 2001, and a status hearing date was set for June 6, 2001.

¶ 4. On May 30, 2001, Harris filed a demand for discovery and inspection with the court and the State. In it, Harris demanded that the State provide all exculpatory evidence, including evidence that would lead to further investigation.[3]

¶ 5. Additionally, Harris changed his plea to a plea of not guilty by reason of mental disease or defect (NGI). The court ordered a psychological examination, which was conducted by Dr. Steven Braam and filed with the court on July 11, 2001. After reviewing Dr. Braam's report, Harris decided not to pursue an NGI plea and informed the court that the defense would be seeking its own expert to conduct an evaluation. However, Harris later informed his attorney that he did not wish to pursue a consultation with the second doctor and that he wished to enter a guilty plea.

¶ 6. On July 25, 2001, Harris pled guilty to first-degree sexual assault of a child, as a repeater. As part of the plea agreement, a bail jumping count in this case, plus one count of disorderly conduct while armed, and one count of carrying a concealed weapon would be dismissed and read in for the purposes of sentencing. On September 21, 2001, the court sentenced Harris to an initial period of thirty years' confinement, followed by fifteen years of extended supervision, for a total sentence of forty-five years.

¶ 7. Shortly after sentencing, based on the directive of District Attorney Phillip Koss, Assistant District

---

[3] This document is not part of the appellate record. However, it is referred to in Harris's motion to withdraw his guilty plea and again referred to by Harris's attorney in the transcript of the postconviction motion hearing. The State does not dispute that the discovery demand was filed.

Attorney Maureen Boyle informed Harris's trial counsel that in June 2001, B.M.M. made an allegation that her grandfather had sexually assaulted her in February 2001. In her allegation, B.M.M. reported that her grandfather had touched her vaginal area as well as her "butt crack." Boyle had not previously disclosed this information to the defense.

¶ 8. Harris filed a Motion for Postconviction Discovery and a Motion to Withdraw Guilty Plea. The court conducted a hearing on July 25, 2002. Following arguments by both attorneys, the court granted Harris's motion to withdraw his guilty plea and entered an order to that effect. The court found that the State failed to turn over potentially exculpatory evidence in violation of Harris's constitutional rights. The court found that Harris was unaware of the potential challenges to the case because of the violation. The court noted Harris's offer of proof that he would not have pled guilty if the evidence had been disclosed to him. The State appeals.

## Standards of Review

¶ 9. A motion for withdrawal of a plea ordinarily is addressed to the circuit court's discretion. *State v. Sturgeon*, 231 Wis. 2d 487, 495, 605 N.W.2d 589 (Ct. App. 1999). When a motion to withdraw a plea is made after sentencing, the defendant must establish by clear and convincing evidence that withdrawal is necessary to correct a manifest injustice. *Hatcher v. State*, 83 Wis. 2d 559, 564, 266 N.W.2d 320 (1978). To sustain the circuit court's decision, this court must ensure that the circuit court's determination was made upon the facts of record and in reliance on the appropriate and applicable law. *Sturgeon*, 231 Wis. 2d at 495. We review

questions of constitutional fact independently to determine whether any constitutional principles have been offended. *Id.* at 496. However, the underlying historical facts remain subject to the clearly erroneous standard. *Id.*

## Discussion

¶ 10. The State argues that the circuit court erred when it determined that the prosecutor's failure to disclose information about B.M.M.'s report of a sexual assault by her grandfather violated Harris's constitutional rights. We do not agree and for both constitutional and statutory reasons, we uphold the order of the circuit court.

¶ 11. *Constitutional Issue.* The leading Wisconsin case on withdrawal of a plea when the State has suppressed exculpatory evidence prior to a plea is *Sturgeon.* After a complaint was filed against Sturgeon alleging burglary and misdemeanor theft as a party to the crime, Sturgeon filed a Demand for Discovery and Inspection, which included a request for "[a]ll exculpatory evidence." *Id.* at 490, 492. As a result, Sturgeon's attorney examined the district attorney's file and discovered a police report detailing Sturgeon's confession. *Id.* at 492. The confession itself was not reduced to writing. *Id.* At the preliminary hearing, an alleged accomplice in the crimes testified against Sturgeon in accord with Sturgeon's confession, implicating Sturgeon in the planning and execution of the theft and burglary. *Id.* Sturgeon then filed a motion to suppress his confession, contending that it was not voluntary. *Id.* The trial court denied Sturgeon's motion.

¶ 12. Plea agreement discussions ensued. *Id.* at 493. An agreement was negotiated whereby Sturgeon would plead guilty to the burglary charge and the State

would dismiss and read in the theft charge. *Id.* In addition, the State agreed to not seek prison time. *Id.* Faced with Sturgeon's confession and the incriminating testimony of his alleged accomplice, Sturgeon's attorney recommended that Sturgeon accept the proposal. *Id.* Sturgeon agreed, and following his plea of guilty, Sturgeon was convicted of burglary as a party to the crime. *Id.* at 490. The trial court withheld sentence and placed Sturgeon on probation for five years, conditioned on 120 days in the county jail. *Id.* at 493.

¶ 13. Represented by new counsel, Sturgeon moved to withdraw his guilty plea and sought an order directing the Lake Geneva police department to produce all material related to any statements given by Sturgeon. *Id.* The motion stated that Sturgeon had reason to believe that his statements to the police included his exculpatory assertion that he was unaware of his alleged accomplice's plan to steal. *Id.* The State agreed to voluntarily turn over the requested materials. *Id.* These materials revealed a transcript containing exculpatory assertions made by Sturgeon and given to the police three days after the crimes. *Id.* at 493–94. The State acknowledged that this exculpatory version of Sturgeon's role in the event was not included in the police report documenting Sturgeon's confession. *Id.* at 494. The circuit court concluded that Sturgeon had not established a manifest necessity for withdrawal of his guilty plea. *Id.* at 495.

¶ 14. On appeal, the issue was whether the circuit court properly denied Sturgeon's request to withdraw his guilty plea after sentencing. *Id.* at 490. We concluded the circuit court erred and reversed because of the State's failure to provide Sturgeon with exculpatory evidence related to his confession to the police and because such failure caused Sturgeon to plead guilty. *Id.*

We concluded that the "relevant inquiry is whether there is a reasonable probability that, but for the failure to disclose, the defendant would have refused to plead and would have insisted on going to trial." *Id.* at 503–04. The factors that may bear upon this question include:

> (1) the relative strength and weakness of the State's case and the defendant's case; (2) the persuasiveness of the withheld evidence; (3) the reasons, if any, expressed by the defendant for choosing to plead guilty; (4) the benefits obtained by the defendant in exchange for the plea; and (5) the thoroughness of the plea colloquy. These are examples of relevant considerations and are not intended to be exhaustive. The particular case may present other relevant considerations.

*Id.* at 504.

¶ 15. In the appeal at bar, the State asserts that our holding in *Sturgeon* has been effectively overruled by *United States v. Ruiz*, 536 U.S. 622 (2002). We do not agree. The issue before the Court in *Ruiz* was "whether the Fifth and Sixth Amendments require federal prosecutors, before entering into a binding plea agreement with a criminal defendant, to disclose 'impeachment information relating to any informants or other witnesses.' " *Id.* at 625 (citation omitted).

¶ 16. Immigration agents found thirty kilograms of marijuana in Angela Ruiz's luggage, after which federal prosecutors offered her what is known in the Southern District of California as a "fast track" plea bargain. *Id.* A "fast track" plea bargain asks a defendant to waive indictment, trial, and an appeal. *Id.* In return, the government agrees to recommend to the sentencing judge a two-level departure downward from the otherwise applicable United States Sentencing Guidelines sentence. *Id.*

209

¶ 17. The prosecutors' proposed plea agreement contained a set of detailed terms. *Id.* Among other things, it specified that "any [known] information establishing the factual innocence of the defendant" "has been turned over to the defendant," and it acknowledged the government's "continuing duty to provide such information." *Id.* (citation omitted). At the same time, it required that the defendant "waiv[e] the right" to receive "impeachment information relating to any informants or other witnesses" as well as the right to receive information supporting any affirmative defense the defendant raises if the case goes to trial. *Id.* (citation omitted). Because Ruiz would not agree to this waiver, the prosecutors withdrew their offer and indicted Ruiz for unlawful drug possession. *Id.* Despite the absence of any agreement, Ruiz ultimately pled guilty. *Id.* at 625–26.

¶ 18. At sentencing, Ruiz asked the judge to grant her the same two-level downward departure that the government would have recommended had she accepted the "fast track" agreement. *Id.* at 626. The government opposed her request, and the district court denied it, imposing a sentence within the standard guidelines. *Id.*

¶ 19. Ruiz appealed her sentence to the United States Court of Appeals for the Ninth Circuit. *Id.* The Ninth Circuit vacated the district court's sentencing determination. *Id.* The Ninth Circuit pointed out that the Constitution requires prosecutors to make certain impeachment information available to a defendant before trial. *Id.* It decided that this obligation entitles defendants to receive that same information before they enter into a plea agreement. *Id.* The Ninth Circuit also decided that the Constitution prohibits defendants from waiving their right to that information. *Id.* It held

that the prosecutors' standard "fast track" plea agreement was unlawful because it insisted upon that waiver. *Id.* The Ninth Circuit remanded the case so that the district court could decide any related factual disputes and determine an appropriate remedy. *Id.*

¶ 20. The government sought certiorari review. *Id.* It stressed what it considered to be serious adverse practical implications of the Ninth Circuit's constitutional holding. *Id.* The United States Supreme Court granted the government's petition. *Id.* The Court stated: "The constitutional question concerns a federal criminal defendant's waiver of the right to receive from prosecutors exculpatory impeachment material—a right that the Constitution provides as part of its basic 'fair trial' guarantee." *Id.* at 628. The question before the Court was whether the Constitution requires preguilty plea disclosure by the federal government of impeachment information. *Id.* at 629.

¶ 21. The Supreme Court offered three main considerations for its ultimate holding that the Constitution does not require the federal government to disclose material impeachment evidence prior to entering into a plea agreement with a criminal defendant. *Id.* at 629–33. First, it stated that impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary (knowing, intelligent, and sufficiently aware). *Id.* at 629. It noted that impeachment information is difficult to characterize as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant. *Id.* at 630.

¶ 22. Second, the Court reiterated its previous case law holdings that the Constitution, in respect to a defendant's awareness of relevant circumstances, does

not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor. *Id.* It then specifically included a defendant's ignorance of grounds for impeachment of potential witnesses at a possible future trial as not barring a court from accepting that defendant's guilty plea. *See id.* at 631.

¶ 23. Third, it stated that "due process considerations, the very considerations that led [it] to find trial-related rights to exculpatory and impeachment information in *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] and *Giglio* [*v. United States*, 405 U.S. 150 (1972)[4]], argue against the existence of the 'right' that the Ninth Circuit found here." *Ruiz*, 536 U.S. at 631. The Court pointed out that the added value of the Ninth Circuit's "right" to a defendant is often limited, for it depends upon the defendant's independent awareness of the details of the government's case. *Id.*

¶ 24. The Court then discussed the fact-specific way the case before it protected Ruiz's constitutional rights: "the proposed plea agreement at issue here specifies, the Government will provide 'any information establishing the factual innocence of the defendant.' "

---

[4] In *Giglio v. United States*, 405 U.S. 150, 154–55 (1972), the United States Supreme Court held that if the assistant United States attorney, who first dealt with a key government witness, promised the witness that he would not be prosecuted if he cooperated with the government, such a promise was attributable to the government, regardless of whether the attorney had the authority to make it, and nondisclosure of the promise, which was not communicated to the assistant United States attorney who tried the case, would constitute a violation of due process requiring a new trial.

*Id.* The Court emphasized that "[t]hat fact, along with other guilty-plea safeguards, see Fed. Rule Crim. Proc. 11, diminishes the force of Ruiz's concern that, in the absence of impeachment information, innocent individuals, accused of crimes, will plead guilty." *Ruiz*, 536 U.S. at 631 (citing *cf. McCarthy v. United States*, 394 U.S. 459, 465–67 (1969) (discussing Rule 11's role in protecting a defendant's constitutional rights)).

¶ 25. The Court discussed its specific concerns with upholding the Ninth Circuit's rule. It stated that the Ninth Circuit's rule could "seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure efficient administration of justice." *Ruiz*, 536 U.S. at 631. It said that the rule risks premature disclosure of government witness information, which could disrupt ongoing investigations and expose prospective witnesses to serious harm. *Id.* at 631–32. It concluded that "[c]onsequently, the Ninth Circuit's requirement could force the Government to abandon its 'general practice' of not 'disclos[ing] to a defendant pleading guilty information that would reveal the identities of cooperating informants, undercover investigators, or other prospective witnesses.' " *Id.* at 632 (citation omitted). The Court opined that the Ninth Circuit's rule could require the government to devote substantially more resources to trial preparation prior to plea bargaining, thereby depriving the plea-bargaining process of its main resource-saving advantages or it could lead the government instead to abandon its heavy reliance upon plea bargaining in a vast number—90% or more—of federal criminal cases. *Id.*

¶ 26. The Court then specifically upheld the constitutionality of the "fast track" plea agreement's requirements that a defendant (1) acknowledge that the

213

government has turned over "any [known] information establishing the factual innocence of the defendant" (the "fast track" agreement also provided the government's acknowledgement that it has a continuing duty to provide such information), (2) waive the right to receive impeachment information relating to any informants or other witnesses, and (3) waive the right to receive information the government has regarding any "affirmative defense" he or she raises if the case goes to trial. *Id.* at 625, 632–33 (citation omitted).

¶ 27. Upon careful examination of *Sturgeon* and *Ruiz*, we hold the two to be distinguishable. In *Ruiz*, the defendant did not make a written discovery demand for all "exculpatory" evidence. In fact, Ruiz did not make a discovery demand at all. Rather, the government's proposed "fast track" plea agreement required Ruiz to acknowledge that the government had turned over "any [known] information establishing the factual innocence of the defendant" and provided the government's acknowledgement that it has a continuing duty to provide such information. *Ruiz*, 536 U.S. at 625. Ruiz refused to accept the "fast track" plea agreement because of its requirement that she also waive the right to receive "impeachment information relating to any informants or other witnesses." *Id.* In its analysis, the Court considered it relevant that Ruiz was protected both by the provision in the federal "fast track" plea agreement requiring the government to provide her "any information establishing the factual innocence of the defendant," and by other guilty-plea safeguards contained in the federal rules. *Id.* at 631.

¶ 28. Conversely, in *Sturgeon*, the defendant was prosecuted by the State of Wisconsin and was not protected by a specific provision such as that found in the federal "fast track" agreement offered to Ruiz, nor

214

was Sturgeon protected by guilty-plea safeguards contained in the Federal Rules of Criminal Procedure. Moreover, unlike Ruiz, Sturgeon made both a *Brady* demand and a statutory demand for exculpatory evidence. Sturgeon, by filing a discovery demand, invoked the State's constitutional and statutory obligation to comply; in contrast, Ruiz, in not filing a discovery demand, did not invoke an obligation on the government's part. In fact, the government, in its "fast track" plea offer, was in essence asking Ruiz to forego filing a discovery demand and thereby asking her to forego invoking any governmental constitutional obligations to provide her with material impeachment evidence prior to entering the plea agreement.

¶ 29. We read the thrust of the Supreme Court's holding in *Ruiz* to be rooted in its desire to preserve the federal "fast track" plea bargain process, which the Court implies offers the federal defendant adequate built in protections. The Court emphasizes that without the federal "fast track" plea bargain process, there would be significant interference with the administration of the federal plea bargain process as a whole— possibly leading the federal government "to abandon its heavy reliance upon plea bargaining in a vast number —90% or more—of federal criminal cases." *Ruiz*, 536 U.S. at 632.

¶ 30. In short, we are satisfied that the facts and analysis of *Ruiz* limit its application to federal plea negotiations; thus, it does not overrule *Sturgeon*. Moreover, we again emphasize that in *Sturgeon*, we addressed a defendant's pre-plea written discovery demand and a State prosecutor's failure to turn over exculpatory evidence in its exclusive control. We do not believe that the United States Supreme Court meant *Ruiz*—a federal case which did not address a written

pre-plea discovery demand—to sweep with such a broad brush as to overrule a state precedent, such as *Sturgeon*, which holds that once a defendant makes a pre-plea discovery demand requesting any potentially exculpatory evidence in the State's exclusive control, the State must provide the defense with the evidence before the plea is taken. *Cf. Brady*, 373 U.S. at 90 (where the United States Supreme Court stated: "We usually walk on treacherous ground when we explore state law, for state courts, state agencies, and state legislatures are its final expositors under our federal regime." (Footnote omitted.)).

¶ 31. Thus, the circuit court correctly applied a *Sturgeon* analysis in making its decision—in so doing, it properly exercised its discretion when it allowed Harris to withdraw his plea. Here, as in *Sturgeon*, we rely on *Hatcher*, 83 Wis. 2d at 565, which established the following test for plea withdrawal: When a defendant's assertion of a violation of a constitutional right forms the basis for a plea withdrawal request, he or she may withdraw the plea as a matter of right by demonstrating: (1) that a violation of a constitutional right has occurred; (2) that this violation caused the defendant to plead guilty; and (3) that at the time of the plea, the defendant was unaware of the potential constitutional challenges to the case against him or her because of the violation. *See also Sturgeon*, 231 Wis. 2d at 496.

■

¶ 32. *Violation of a Constitutional Right.* We first examine whether Harris has established a constitutional violation. A defendant has a constitutional right to all material exculpatory evidence in the hands of the prosecutor. *State v. DelReal*, 225 Wis. 2d 565, 570, 593 N.W.2d 461 (Ct. App. 1999); *Brady*, 373 U.S. at 87.

Harris contends that the State failed to comply with this duty to turn over such evidence.

¶ 33. Here, the evidence is potentially exculpatory for several reasons: one, because it shows an alternative source for B.M.M's sexual knowledge; two, it shows that it is possible that the child did not wish to disclose the sexual assault by the grandfather and projected it onto Harris; three, suppression of this evidence potentially violates Harris's right of confrontation, that is, it impairs Harris's ability to effectively cross-examine the prosecution's expert witness, a witness who the State's notice related "will testify regarding reactive behaviors common among child sexual abuse victims."

¶ 34. As it did at the trial court level, the State argues that the evidence of the sexual assault by the child's grandfather is not material to Harris's case under *State v. Pulizzano*, 155 Wis. 2d 633, 456 N.W.2d 325 (1990). The circuit court characterized the State's argument as an attempt at "backfilling . . . because [it] didn't turn over the evidence to start with." We agree with the circuit court's characterization of the State's self-serving argument which seemingly ignores that it is the court's function, not the prosecutor's, to determine what may or may not be admitted into evidence. *See Nelson v. State*, 59 Wis. 2d 474, 484, 208 N.W.2d 410 (1973). What is more, Harris moved the court to reopen his case; he did not ask the court to admit *Pulizzano* evidence in his motion, so the question whether to admit *Pulizzano* evidence was not before the circuit court.

¶ 35. Furthermore, whether there was a constitutional violation is not governed by whether the circuit court would ultimately reject the evidence under *Pulizzano*. The relevant inquiry is what was in Harris's mind when he chose to plead guilty without the benefit of the

217

withheld evidence. Here, the record is not fully developed; for example, the preliminary hearing was waived. Until the record is established, it is not possible to determine if the suppressed evidence is admissible under *Pulizzano* or some other exception to the rape-shield law.

¶ 36. Hence, the State violates the Constitution if it withholds the type of information that could form the basis for further investigation by the defense. Here, the prosecution withheld evidence of a prior sexual assault. Thus, under our independent standard of review of the ultimate constitutional fact question, we hold that this evidence is potentially exculpatory and that it was within the exclusive control of the prosecution. As such, Harris has established a constitutional violation.

¶ 37. *Awareness of the Potential Constitutional Challenge Because of the Violation.* Before addressing the second *Hatcher* factor, causation, we discuss the third factor—whether, at the time of the guilty plea, Harris was unaware of the potential constitutional challenges to the case because of the violation. *See Hatcher*, 83 Wis. 2d at 565. We do so because this question is governed, in large part, by the undisputed fact that the evidence was in the State's exclusive control. The State does not attempt to argue that Harris was aware of his potential constitutional challenges. Clearly, Harris was unaware of his potential constitutional challenges to the case against him because he was not made aware of B.M.M.'s sexual assault accusations against her grandfather until after his pleas and sentencing. For this reason, under our independent standard of review of the constitutional fact question, we hold that Harris has satisfied this third factor under *Hatcher*.

¶ 38. *Causation.* Finally, we examine the second *Hatcher* factor—whether the constitutional violation caused Harris to plead guilty. *See id.* With regard to this factor, we are guided by *Sturgeon,* which, like the case at bar, addressed a plea withdrawal request based on the postplea discovery of exculpatory evidence. *See Sturgeon,* 231 Wis. 2d at 502. In *Sturgeon,* we concluded that the relevant inquiry for this factor is whether there is a reasonable probability that, but for the failure to disclose, the defendant would have refused to plead and would have insisted on going to trial. *Id.* at 503–04.

¶ 39. The subfactors which may bear upon this question include but are not limited to: (1) the relative strength and weakness of the State's case and the defendant's case; (2) the persuasiveness of the withheld evidence; (3) the reasons, if any, expressed by the defendant for choosing to plead guilty; (4) the benefits obtained by the defendant in exchange for the plea; and (5) the thoroughness of the plea colloquy. *Id.* at 504.

¶ 40. First, the relative strength and weakness of the State's case and Harris's case are difficult to ascertain because Harris was without knowledge of B.M.M.'s alleged sexual assault by her grandfather. Thus, Harris —who had a history of extensive psychological problems—was left to rely on his word versus the statements of a six-year-old girl and an expert witness who was set to testify that the child's actions were consistent with an individual who had been sexually assaulted. In contrast to a six-year-old child and an expert, Harris's testimony would likely be assessed by a fact finder with skepticism. We conclude that this factor weighs in Harris's favor.

¶ 41. Second, the persuasiveness of the withheld evidence also weighs in Harris's favor. The withheld evidence is an alleged sexual assault, which occurred two months before Harris's alleged sexual assault and which details a similar type of sexual contact as that alleged against Harris. This type of evidence constitutes evidence which may be allowed under *Pulizzano* (though we again note that the circuit court at the postconviction hearing did not have before it a *Pulizzano* motion because the State's suppression of the information prevented Harris from seeking a *Pulizzano* motion). The withheld evidence would have presented an alternative explanation for the origin of the allegations against Harris. If the evidence had been turned over to Harris before he pled, he would have had the opportunity to do further investigation and attempt to present the *Pulizzano* evidence.

¶ 42. Third, we additionally conclude that the reasons expressed by Harris for choosing to plead guilty weigh in his favor. At the postconviction motion hearing, the defense was ready to present testimony from Harris and his former counsel. The defense asked the circuit court its preference as to providing this testimony or making an offer of proof. The court called for an offer of proof. The defense then made an offer of proof that Harris, given his mental health history, believed that he had no choice but to plead guilty in light of the testimony of B.M.M. and the State's expert witness. The State did not object to the offer of proof. Moreover, this offer of proof is comparable to the offer of proof accepted in *Sturgeon* where the defendant offered his testimony that he felt he had no choice but to plead guilty in light of the confession he made to the police and his alleged accomplice's testimony. *See Sturgeon*, 231 Wis. 2d at 506.

¶ 43. Fourth, we consider the benefits obtained by Harris in exchange for the plea. In the plea agreement, Harris pled guilty to first-degree sexual assault of a child, as a repeater, which had an exposure of seventy years' imprisonment. In exchange for that plea, three charges were dismissed and read in and the State remained silent. We agree with the circuit court that Harris's benefit was slight relative to the State's benefit in exacting a plea that exposed Harris to imprisonment of seventy years. We conclude that the State received a great deal more in this bargain, and this subfactor weighs in Harris's favor.

¶ 44. Finally, we consider the plea colloquy. Here, like the circuit court in *Sturgeon*, the circuit court's colloquy with Harris was thorough and complete. *See id*. Thus, this factor weighs in favor of the State. However, this is the least persuasive of the factors because a plea colloquy, no matter how thorough, could never address a situation in which the State has withheld exculpatory evidence given that such an event is unknown to the circuit court at the time of the plea. *Id.* at 506–07.

¶ 45. We conclude that the record in this case establishes, as a matter of law, that Harris has demonstrated that the constitutional violation caused him to plead guilty.

¶ 46. *Statutory Violation*. Harris made a discovery demand pursuant to WIS. STAT. § 971.23, which governs our state's discovery laws. Section 971.23(1) provides in pertinent part:

(1) WHAT A DISTRICT ATTORNEY MUST DISCLOSE TO A DEFENDANT. Upon demand, the district attorney shall, within a reasonable time before trial, disclose to the defendant

221

or his or her attorney and permit the defendant or his or her attorney to inspect and copy or photograph all of the following materials and information, if it is within the possession, custody or control of the state:

. . . .

*(h) Any exculpatory evidence.* (Emphasis added.)

The district attorney's nondisclosure of the evidence of B.M.M.'s allegation of a previous sexual assault is a violation of the statute. The State argues that the statutory term "exculpatory evidence" is limited to evidence that is constitutionally required to be disclosed. The State references *Sturgeon* for this proposition where, in a footnote, we stated that the defendant's due process claim under *Brady* is commensurate with the requirement of § 971.23(1)(h). *Sturgeon*, 231 Wis. 2d at 497 n.4. We disagree with the State's reading. Our review of the legislative history of § 971.23(1)(h) does not support that it was simply meant to be a codification of *Brady*. The discovery statute in Wisconsin is apart from constitutional law principles and directs the district attorney, upon demand, to disclose "[a]ny exculpatory evidence." Harris made a statutory demand and the State's failure to disclose the potentially exculpatory evidence of an alleged sexual assault by B.M.M.'s grandfather was a violation of § 971.23(1)(h).

## Conclusion

¶ 47. The circuit court did not err when it determined that the prosecutor's failure to disclose information about B.M.M.'s report of a sexual assault by her grandfather violated Harris's constitutional rights. In addition, the State violated Wis. Stat. § 971.23(1)(h) when it failed to disclose potentially exculpatory evi-

dence in response to Harris's statutory demand. As such, Harris has carried his burden of demonstrating that a withdrawal of his guilty plea is necessary to avoid a manifest injustice. We uphold the order of the circuit court.

*By the Court.*—Order affirmed.